**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. [UNDER SEAL] | ) ) ) Civil Action No. ) |
| Plaintiff, | ) ) COMPLAINT FOR DAMAGES ) |
| vs. | ) ) JURY TRIAL DEMANDED ) |
| [UNDER SEAL] | ) ) |
| Defendants. | ) [FILED IN CAMERA AND UNDER SEAL ) PURSUANT TO 31 U.S.C. § 3730(b)(2)] ) ) ) ) ) ) ) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHRIS O'BIER, | ) ) ) Civil Action No. |
| Plaintiff, | ) ) ) ) COMPLAINT FOR DAMAGES |
| vs. | ) ) |
| NANTICOKE HEALTH SERVICES, INC., NANTICOKE MEMORIAL HOSPITAL, INC., KUNAL AGARWAL, M.D., CANDACE MCKNIGHT JOHNSON, BAY VIEW HOMECARE, INC., LINCARE, INC., and DOES 1-50, | ) ) ) ) ) ) ) ) JURY TRIAL DEMANDED [FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)] |
| Defendants. | ) ) ) ) |

## COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT

Plaintiff, UNITED STATES OF AMERICA *ex rel.* CHRIS O'BIER ("O'Bier"), respectfully alleges as follows:

## INTRODUCTION

1.      In this action, O'Bier alleges that defendants NANTICOKE HEALTH SERVICES, INC. ("Nanticoke Health"), NANTICOKE MEMORIAL HOSPITAL, INC. ("Nanticoke Memorial"), KUNAL AGARWAL, M.D. ("Dr. Agarwal"), CANDACE MCKNIGHT JOHNSON ("Johnson"), BAY VIEW HOMECARE, INC. ("BayView"), and LINCARE, INC. ("Lincare") (collectively, Nanticoke Health, Nanticoke Memorial, Dr. Agarwal, Johnson, BayView, and Lincare are "Defendants") are liable under 31 U.S.C. § 3729, et seq. (the "False Claims Act") for submitting and conspiring to submit false claims in violation of the Anti-kickback statute and the Stark law self-referral prohibition to Medicare and Medicaid.

1

## JURISDICTION AND VENUE

2.      O'Bier brings this action on behalf of the United States of America under the provisions of the False Claims Act. Accordingly, this Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345.

3.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and the alleged acts in violation of the False Claims Act occurred within this judicial district.

4.      Venue is appropriate in this judicial district under 31 U.S.C. § 3732(a) because Defendants reside in and transact business in this judicial district; their principal places of business are located in this judicial district; and the acts alleged below (as violations of 31 U.S.C. §§ 3729(a)(1)(A)-(C)) occurred in this judicial district.

## THE PARTIES

5.      The United States is the plaintiff in this action. O'Bier is seeking recovery on the United States' behalf.

6.      Relator O'Bier is an individual and citizen of the United States of America residing in Sussex County, Delaware. O'Bier is the owner of Peninsula Home Health Care, Inc. ("Peninsula"), a Delaware Corporation. Established in 1995, Peninsula is a full-service durable medical equipment ("DME") company which accepts most all insurances including Medicare and Medicaid.

7.      The allegations and transactions upon which O'Bier bases this complaint were not publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party. Nor have they been disclosed in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in the news media.

8.      O'Bier's knowledge of the allegations and events in this complaint is derived from her own efforts and labor. O'Bier's knowledge is not based on publicly

disclosed information, and her knowledge preceded any public disclosure of the allegations and transactions in this complaint.

9.  Defendant Nanticoke Health is a Delaware corporation located in Sussex County in the State of Delaware.

10.  Defendant Nanticoke Memorial upon information and belief is a non-profit Delaware corporation owned by Nanticoke Health, which operates a hospital in Sussex County in the State of Delaware.

11.  Defendant Dr. Agarwal is a Delaware licensed physician and is board certified in family medicine and sleep medicine. Dr. Agarwal is the Medical Director of the Nanticoke Sleep Disorders Center, a division within Nanticoke Memorial, and upon information and belief the owner of Nanticoke Primary Care Seaford in Sussex County in the State of Delaware.

12.  Defendant Johnson is a licensed family nurse practitioner, and upon information and belief, is employed as a nurse practitioner by Nanticoke Memorial in Sussex County in the State of Delaware.

13.  Defendant BayView is a Maryland corporation, with locations in Baltimore in the State of Maryland, and in Seaford in the State of Delaware. Bayview is a medical equipment company providing durable medical equipment to patients residing in or around Baltimore County in the State of Maryland and Sussex County in the State of Delaware.

14.  Defendant Lincare is a Delaware corporation operating as a medical equipment company serving the counties of Kent, Newcastle, and Sussex in the State of Delaware. Upon information and belief, Lincare is wholly or partially owned by Lincare Holdings Inc., a Florida corporation.

15.  O'Bier is ignorant of the true names and capacities, whether individual, partnership, corporate, associate or otherwise, of DOES 1 to 50, and therefore sues these defendants by fictitious names. O'Bier is informed and believes, and on that basis alleges,

that these fictitiously named defendants, and each of them, are in some manner responsible and liable for the acts and/or damages alleged in this Complaint. O'Bier will seek leave of court to amend this Complaint to show the fictitiously named defendants' true names and capacities when they have been ascertained. O'Bier is informed and believes, and on that basis alleges, that each of the fictitiously named defendants were, in some manner, responsible for the occurrences herein alleged, and proximately caused the damages alleged in this Complaint.

16.     O'Bier is informed and believes, and on that basis alleges, that at all relevant times (except where pled otherwise) Defendants were acting as the agents, servants, employees, partners, and/or joint venturers of each other. Defendants maintain such unity of interest that separate personalities of each defendant no longer exist. In doing the wrongful acts alleged herein, each defendant was acting in the full course and scope of such agency, employment, partnership, and/or joint venture with the full knowledge, consent, permission, and ratification, either express or implied, of each of the other defendant; and as such, was acting as the alter ego of each other defendant. Adherence to the fiction of the separate existence of each defendant would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

## THE FALSE CLAIMS ACT

17.     The Federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the False Claims Act in 1986 to enhance the ability of the United States to recover losses sustained due to fraud against it.

18.     On May 20, 2009, Congress amended and renumbered the False Claims Act again pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA").

19.     The False Claims Act, under the FERA amendments, sets forth liability, in pertinent part, for any person who:

(A)   knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval; [or]

(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C)   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); …

31 U.S.C. §§ 3729(a)(1)(A)-(C).

20.    The False Claims Act further provides, in pertinent part, that "knowing" and "knowingly:"

(A)   mean that a person, with respect to information—
  (i)    has actual knowledge of the information;
  (ii)   acts in deliberate ignorance of the truth or falsity of the information; or
  (iii)  acts in reckless disregard of the truth or falsity of the information; and

(B)   require no proof of specific intent to defraud.

31 U.S.C. §§ 3729(b)(1)(A)-(B).

And the term, "claim:"

(A)   means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
  (i)    is presented to an officer, employee, or agent of the United States; or
  (ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
    (I)    provides or has provided any portion of the money or property requested or demanded; or
    (II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or other property which is requested or demanded; and

(B)   does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property; . . .

31 U.S.C. §§ 3729(b)(2)(A)-(B).

21.    The False Claims Act allows any person having information about a possible violation of the False Claims Act to bring an action on behalf of the United States, and to share in any recovery. 31 U.S.C. §§ 3730(b), (d)(1). The False Claims Act

also awards reasonable attorneys' fees and costs to the prevailing *qui tam* plaintiff as a matter of right. 31 U.S.C. § 3730(d)(1).

**THE MEDICARE AND MEDICAID PROGRAMS**

22.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

23.     The Medicare Program is comprised of four parts. Medicare Parts A, C, and D are not directly at issue in this case.

24.     Medicare Part B provides federal government funds to help pay for, among other things, Durable Medical Equipment ("DME") provided to Medicare beneficiaries. *See generally* 42 U.S.C. §§ 1395j – 1395w-5.

25.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the federal treasury. Eligible individuals may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by the United States Department of Health & Human Services ("HHS"). *See* 42 U.S.C. §§ 1395o, 1395p, 1395q, 1395r, 1395s.

26.     Payments under the Medicare Program are often made directly to service providers, rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits its bill directly to Medicare for payment.

27.     The Secretary of HHS administers the Medicare Program through the Centers for Medicare & Medicaid Services ("CMS"), an operating division of HHS.

28.     CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as Part B Carriers (hereinafter, "MACs") to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the "Medicare Trust Fund"). In this capacity, MACs act on behalf of CMS.

29.     The Medicare Program, through the MAC, pays a significant portion of

every claim. The Medicare beneficiary, or his or her supplemental insurance carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-payment." Beneficiaries also pay deductibles.

30.     All healthcare providers must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for the Medicare services.

31.     Under the Medicare program, the patients' right to freely choose their health service provider is guaranteed: "Basic freedom of choice. Any individual entitled to insurance benefits under this title [42 USCS §§ 1395et seq.] may obtain health services from any institution, agency, or person qualified to participate under this title [42 USCS §§ 1395 et seq.] if such institution, agency, or person undertakes to provide him such services." 42 U.S.C. § 1395a.

32.     Title XIX to the Social Security Act establishes the Medicaid Program. *See generally* 42 U.S.C. §§ 1396, et seq.

33.     Under the Medicaid Program, the federal government provides matching funds to states to enable them to provide medical assistance to residents who meet certain eligibility requirements.

34.     Although states are not required to participate, those that do must comply with federal Medicaid laws. *See, e.g.,* 42 U.S.C. §§ 1396-1, 1396a.

35.     The Delaware Division of Medicaid and Medical Assistance (DMMA), within the Department of Health and Social Services (DHSS), administers Delaware's Medicaid program jointly with CMS of the federal government.

## THE ANTI-KICKBACK STATUTE

36.     The federal Anti-Kickback Statute ("AKS") was first enacted in 1972 out of concern that payoffs to those who can influence healthcare decisions will result in the provision of goods and services that are medically unnecessary, of poor quality, or even

harmful to a vulnerable patient population. To protect the integrity of federal healthcare programs from these difficult-to-detect harms, Congress enacted a broad prohibition against the payment of kickbacks in any form, regardless of whether a particular kickback actually gives rise to overutilization, or results in poor-quality care.

37.     Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. The AKS was further amended in the Patient Protection and Affordable Care Act of 2010 so that "all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act[.]" 155 Cong. Rec. S10854. Even prior to the Affordable Care Act amendments, violations of the AKS still gave rise to False Claims Act liability under the implied false certification theory.

38.     The AKS provides, in relevant part:
(b) Illegal remunerations.
  (1)   Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
       (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
       (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
  (2)   shall be guilty of a felony and conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. §§ 1320a-7b(b)(1)-(2).

39.     42 C.F.R. § 1001.952 sets forth "safe harbor" regulations that describe payment practices that do not violate the AKS, provided the payment practice fits squarely within the safe harbor. 68 Fed. Reg. 14252 (March 24, 2003). Arrangements that do not fit in a safe harbor must be analyzed under the AKS on a case-by-case basis to determine if there is a violation. *Id.*

40.     The AKS defines "Federal health care program" as: "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government . . . or (2) any State health care program, as defined in section 1128(h) [42 USCS § 1320a-7(h)]." 42 U.S.C. § 1320a-7b(f). This definition encompasses Medicare and Medicaid.

41.     Under the Affordable Care Act amendments, any claim submitted for a service, the provision of which resulted from a violation of the AKS, is "false" for purposes of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

42.     The Affordable Care Act amendments do not require actual knowledge of the AKS or specific intent to commit a violation of the AKS (and, by extension, the False Claims Act). *See* 42 U.S.C. § 1320a-7b(h).

43.     "The key inquiry under the AKS is whether the parties intend to pay, or be paid for referrals. Paying for referrals need not be the only or primary purpose of a payment; as courts have found, if any *one* purpose of the payment is to induce or reward referrals, the statute is violated. (See, e.g., *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985).)" 68 Fed. Reg. 14251 (March 24, 2003) (emphasis in original).

44.     "Importantly, under the [AKS], neither a legitimate business purpose for an arrangement nor a fair-market value payment will legitimize a payment if there is also an illegal purpose (i.e., inducing Federal health care program business)." 73 Fed. Reg. 56841 (Sept. 30, 2008)

## THE STARK LAWS

45.     The Stark laws are a combination of statutes and regulations that address the federal physician self-referral prohibition. *See generally* 42 U.S.C. § 1395nn; 42 CFR 411.350, et seq. (Title 42, Chapter IV, Subchapter B, Part 411, Subpart J [financial relationships between physicians and entities furnishing designated health services]).

46.     Section 1395nn provides in pertinent part:

(a) Prohibition of certain referrals.

(1)  In general. Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then--

(A)  the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this title [42 USCS §§ 1395 et seq.], and

(B)  the entity may not present or cause to be presented a claim under this title [42 USCS §§ 1395 et seq.] or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42  U.S.C. § 1395nn(a)(1)(A)-(B).

47.     By its terms, the Stark laws only apply when a Physician makes a "referral" for designated health services ("DHS"). The term "referral" is defined in the statute to mean (1) any request by a physician for an item or service for which payment may be made under Medicare Part B, including a request for consultation (and any tests or procedures ordered or performed by, or under the supervision of, the consulting physician), and (2) the request or establishment of a plan of care by a physician that includes the furnishing of DHS. *See* 42 U.S.C. § 1395nn(h)(5)(A)-(B); 42 CFR § 411.351.

48.     The Stark prohibition does not apply to requests for certain services integral to a consultation by pathologists, diagnostic radiologists, and radiation oncologists. *See* 42 U.S.C. § 1395nn(h)(5)(C). DME does not fit within these limited exclusions, however, as it is reimbursable under Medicare Part B. 42 CFR §§ 410.10(e), (h) (including "[d]urable medical equipment" under the definition of "medical and other health services"), 410.12(a).

49.     The Code of Federal Regulations makes clear that a "referral" can occur in any form— including written, oral, or electronic—and referrals may be direct or indirect. 42 CFR § 411.351. CMS also revised the definition of "referral" to exclude any DHS personally performed or provided by the referring physician. *Id.* This exclusion is limited, however, because a service is not "personally performed" by the referring physician if it

is performed or provided by any other person, "including but not limited to the referring physician's employees, independent contractors, or group practice members." *Id.*

50.     The financial relationships that trigger the statutory prohibitions on referrals and billing are (1) ownership or investment interests in the entity furnishing the DHS, or (2) compensation arrangements between the Physician and the entity. 42 U.S.C. § 1395nn(a)(2).

51.     These financial relationships can be either direct (remuneration passes between the referring Physician and the DHS entity), or indirect (unbroken chain of ownership interests between the referring Physician and the DHS entity). *See* 42 CFR §§ 411.354(a)(2)(i)(ii), (b)(5).

52.     An "ownership or investment interest" may be through equity, debt, or other means, and includes stock, partnership shares, limited liability company memberships, loans, bonds, or other financial instruments. 42 U.S.C. § 1395nn(a)(2); 42 CFR § 411.354(b)(1).

53.     Compensation arrangements are broadly defined to include arrangements between a Physician and an entity that involve "any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §§ 1395nn(h)(1)(A), (h)(1)(C); 42 CFR §§ 411.351, 411.354(c). These arrangements involve payments that go both ways—i.e., a "compensation arrangement" exists when a Physician pays or receives the compensation.

54.     There are general exceptions in the statute that relate to both ownership/investment interests and compensation arrangements. *See generally* 42 U.S.C. § 1395nn(b). The Stark statute permits Physician referrals to entities in which the referring Physician has either a compensation arrangement or ownership/investment interest so long as it fits within one of four exceptions: (1) Physicians' services, (2) In-office ancillary services, (3) Prepaid plans, and (4) Other permissible exceptions specified in regulations that do not pose a risk of program or patient abuse. 42 U.S.C. §

1395nn(b)(1)-(4).

55.     The physicians' services exception applies to professional services performed by physicians (not interns or residents unless they are under a specifically approved training program in their specialty). 42 U.S.C. §§ 1395nn(b)(1), 1395x(b)(6), (q). These services must be provided personally by, or under the personal supervision of, another physician in the same group practice as the referring physician. 42 U.S.C. §§ 1395nn(b)(1), (h)(4).

56.     The in-office ancillary services exception also applies to professional services (1) performed by members or other physicians of the Physician's group practice (2) in the same building (e.g., a physician's office) or another approved building used by the group practice (3) that are billed by the physician performing or supervising the services (or the group or a billing entity wholly owned by the physician or group). 42 U.S.C. § 1395nn(b)(2). The express statutory terms of the "in-office ancillary services exception" do not protect the furnishing of any DME, except infusion pumps. *See* 42 U.S.C. § 1395nn(b)(2). But the regulations slightly expand the types of DME that fit within this exception (canes, crutches, walkers, folding manual wheelchairs, and blood glucose monitors). 42 CFR § 411.355(b)(4).

57.     The prepaid plan exception protects referrals for DHS services furnished by a managed care organization (or its contractors or subcontractors) to enrollees of one of the listed prepaid health care plans, which includes certain qualified health maintenance organizations and Medicare and Medicaid managed care plans. 42 U.S.C. § 1395nn(b)(3); 42 CFR § 411.355(c).

58.     As for the fourth category exceptions, CMS has created several exceptions to ownership/investment interests and compensation arrangements because of the relatively insignificant risk of fraud, abuse, or overutilization. Such exceptions exist for academic medical centers; for implants (e.g., cochlear implants, intraocular lenses, and other implanted prosthetics and DME) that are implanted during a surgical procedure

performed in the same ambulatory surgery center ("ASC") where the implant was

furnished; for erythropoietin and other dialysis-related outpatient prescription drugs; for

preventative screening tests, immunizations, and vaccines; and for eyeglasses and contact

lenses following cataract surgery. 42 U.S.C. § 1395nn(b)(4); 42 CFR §§ 411.355(f), (g),

(h), (i).

59.     The Stark statute also provides for general exceptions related to

ownership/investment interests specifically. Referrals to entities with which the referring

Physician has an ownership/investment interest are permitted if the ownership or

investment interest is in publicly traded securities or a mutual fund. 42 U.S.C. §

1395nn(c). Also, the ownership or investment interest is permissible if it is in (1) a

hospital in Puerto Rico, (2) an entity furnishing DHS in a rural area (if substantially all of

the DHS furnished by the entity is furnished to individuals residing in the rural area), or

(3) a hospital in which the physician is authorized to perform services, and the physician

owns an interest in the hospital as a whole (not just a subdivision). 42 U.S.C. §

1395nn(d).

60.     In addition to the aforementioned exceptions, the Stark statute has

exceptions relating to "other compensation arrangements" only. The following

arrangements are not considered as prohibited compensation arrangements identified in

42 U.S.C. § 1395nn(a)(2)(B): Payments by a lessee to a lessor for the rental of office

space; Payments by a lessee of equipment to the lessor for the use of the equipment; Any

amount paid by an employer to a Physician in bona fide employment relationships;

Remuneration from an entity under personal service arrangements; Remuneration

unrelated to the provision of DHS; Remuneration provided by a hospital to a physician

for purposes of physician recruitment; Isolated financial transactions (e.g., a one-time

sale of property or practice); Certain group practice arrangements with a hospital; and

Payments by a physician for items and services (e.g., to a laboratory in exchange for the

provision of clinical laboratory services; to an entity as compensation for other items or

13

services at a fair market value price). 42 U.S.C. § 1395nn(e).

61.     The statute defines DHS to mean any of the following items or services:

(A) Clinical laboratory services.
(B) Physical therapy services.
(C) Occupational therapy services.
(D) Radiology services, including magnetic resonance imaging, computerized
axial tomography scans, and ultrasound services.
(E) Radiation therapy services and supplies.
(F) Durable medical equipment and supplies.
(G) Parenteral and enteral nutrients, equipment, and supplies.
(H) Prosthetics, orthotics, and prosthetic devices and supplies.
(I) Home health services.
(J) Outpatient prescription drugs.
(K) Inpatient and outpatient hospital services.
(L) Outpatient speech-language pathology services.

42 U.S.C. § 1395nn(h)(6); *see also* 42 CFR § 411.351.

62.     The Code of Federal Regulations further limits the definition of DHS to
mean only: "DHS payable, in whole or in part, by Medicare. DHS do not include services
that are reimbursed by Medicare as part of a composite rate (for example, SNF Part A
payments or ASC services identified at § 416.164(a)), except to the extent that services
listed in paragraphs (1)(i) through (1)(x) [tracking 42 U.S.C. § 1395nn(h)(6)(A)-(L)] of
this definition are themselves payable through a composite rate (for example, all services
provided as home health services or inpatient and outpatient services are DHS)." 42 CFR
§ 411.351.

63.     For violations of the Stark laws, CMS prohibits Physicians from making
referrals to an entity for a period of disallowance that varies depending on the facts. 42
CFR § 411.353(c)(1); *see also* 73 Fed. Reg. 48,433, 48,700-48,704 (Aug. 19, 2008). The
period of disallowance begins at the time the financial relationship fails to satisfy the
requirements of an applicable exception. 42 CFR § 411.353(c)(1).

64.     For noncompliance with the Stark laws that is unrelated to compensation,
the period of disallowance ends when the relationship between the Physician and the

entity satisfies all of the requirements of the relevant Stark exception. 42 CFR § 411.353(c)(1)(i).

65.     For noncompliance that is due to the payment of excess compensation, the period of disallowance ends when the excess compensation is returned and the parties structure their relationship to fit within an exception. 42 CFR § 411.353(c)(1)(ii).

66.     Above and beyond the periods of disallowance, Stark violations are sanctioned by denials of payments for prohibited claims, or refunds of any amounts collected on such claims. 42 U.S.C. §§ 1395nn(g)(1)-(2); 42 CFR §§ 411.353(c), (d). These remedies focus on the entity rather than the Physician.

67.     The Stark laws further prohibit wrongful conduct in connection with presenting prohibited bills or claims, or failing to refund amounts collected under a prohibited bill or claim. Such persons are subject to civil penalties of up to $15,000 for each service; damages of up to three times the amount of the monetary penalty, and exclusion for the Medicare or Medicaid program. 42 U.S.C. § 1395nn(g)(3).

68.     Moreover, any physician or other entity that enters into a scheme to circumvent the Stark laws by assuring referrals to an entity with which the physician has a prohibited financial relationship may be subject to a civil monetary penalty of up to $100,000 for each arrangement or scheme; damages of up to three times this amount; and exclusion from the Medicare or Medicaid program. 42 U.S.C. § 1395nn(g)(4).

69.     Although the penalties for wrongful conduct under the Stark laws primarily focus on the entity, and not on the referring Physician, a Physician may be penalized for failing to submit certain reports on financial relationships. 42 U.S.C. § 1395nn(g)(5).

70.     CMS has explicitly stated that knowingly submitting a claim in violation of the Stark prohibitions may result in penalties under the False Claims Act and imposition of other federal statutory and common law remedies. *See* 66 Fed. Reg. 859-860 (Jan. 4, 2001).

## PROVIDER CERTIFICATIONS AND FALSE CLAIMS ACT VIOLATIONS

71.     Upon information and belief, Medicare payments comprise a large portion of the Defendants' revenue sources.

72.     All Medicare and Medicaid providers, including the present Defendants, are required to enter into provider agreements with the government, under which, the providers certify that they will comply with all laws and regulations concerning proper practices for Medicare and Medicaid providers.

73.     Pursuant to their provider agreements, the Defendants certified that they are acting in compliance with the AKS and the Stark laws.

74.     Compliance with the provider agreement is a condition for receipt of reimbursements from the Medicare program.

75.      The Defendants' compliance with the AKS and Stark laws and regulations is a condition precedent to receipt of payment from any federally funded health care programs, including all Medicare and Medicaid claims.

76.     A false certification of compliance with the AKS and Stark laws creates liability under the False Claims Act when certification is a prerequisite to obtaining government benefits such as Medicare and other federal health care program reimbursement. U.S. *ex rel* Thompson v. Columbia HCA Health Care Corp., 125 F.3d 899, 901-902 (5th Cir. 1997).

77.     A *qui tam* action under the False Claims Act may be brought by a relator on behalf of the United States, based on alleged violations of AKS and Stark laws. *See* 42 U.S.C. § 1320a-7b(g), *See* U.S. *ex rel* Schmidt v. Zimmer, 386 F.3d 235 (3rd Cir. 2004).

78.     Under the implied certification theory incorporating violations of the AKS and Stark laws, each claim submitted pursuant to an improper referral is separately actionable under the False Claims Act.

## FACTUAL ALLEGATIONS

79.     Nanticoke Memorial is one of the largest hospitals serving residents of Sussex and neighboring counties, many of whom are Medicare and Medicaid beneficiaries. Pertinent to this action are the Nanticoke Sleep Disorder Center, and the Nanticoke Pulmonary Rehabilitation ("Nanticoke Pulmonary"), both within Nanticoke Memorial, which regularly prescribe DME equipment such as oxygen concentrator and other respiratory health equipment, continuance positive airway pressure ("CPAP") machines, and Bilevel Positive Airway Pressure ("BiPAP") machines.

80.     Upon information and belief, from on or about July 2017 through the present, Nanticoke Memorial staff, specifically Dr. Agarwal who is the Medical Director of the Nanticoke Sleep Disorder Center and Johnson, almost exclusively refer all of Nanticoke Memorial's patients to Bayview or Lincare for DME equipment, without providing the patients with the opportunity to choose their own DME provider.

81.     Nanticoke Memorial, Dr. Agarwal, and Johnson have on numerous occasions refused to send patients' prescriptions for DME to Peninsula, despite the fact that Peninsula is a fully certified DME company, is located within the locality of Nanticoke Memorial, and is a credentialed provider for almost all insurances including Medicare and Medicaid. Nanticoke Memorial, Dr. Agarwal, and Johnson have even gone so far as arguing and becoming combative with patients who specifically demand that their prescription be sent to Peninsula.

82.     Patient J.V. visited Nanticoke Sleep Disorder Center, Seaford, within Nanticoke Memorial Hospital, for diagnosis and treatment of his sleep disorder. He was prescribed CPAP treatment by Dr. Agarwal, for which he required a CPAP machine. J.V. specifically asked that he obtain the CPAP machine from Peninsula, and provided Dr. Agarwal and or his staff with Peninsula's business card so they would send his order to Peninsula. Defendant Agarwal, acting on his own and as Nanticoke Sleep Disorder Center's Medical Director, denied J.V.'s request, stating that they do not refer patients to

Peninsula.

83.     Patient C.H. had been diagnosed with a sleep disorder and was undergoing

CPAP treatment. During a follow-up visit at Nanticoke Pulmonary, it was determined

that she needed a new CPAP machine to replace her current one. C.H. asked that her

prescription for a replacement CPAP be sent to Peninsula so Peninsula could provide her

with the replacement. Defendant Johnson, acting on her own as an agent of Nanticoke

Memorial told C.H. that she did not refer patients to Peninsula. Upon learning this

information, O'Bier contacted Nanticoke Pulmonary asking for patient C.H.'s new

prescription, which Johnson never sent.

84.     Patient D.C.B. was treated for respiratory issues at Nanticoke Memorial

Hospital's emergency room, and was required to have oxygen therapy equipment

installed at her residence. D.C.B. who had been a patient of Peninsula since 2004,

specifically asked that her prescription be sent to Peninsula. However, the hospital staff

told her they do not refer patients to Peninsula and that her prescription had to be sent to,

and filled by BayView. When D.C.B. explained that she had been a patient of Peninsula

and wished that her oxygen equipment be provided by Peninsula, she was faced with an

ensuing argument in which the hospital staff vehemently attempted to dissuade her from

using Peninsula, in order to refer her service to BayView. D.C.B. had to steadfastly

object to their refusal to send her prescription to the provider of her choice, ultimately

forcing them to send the prescription to Peninsula.

85.     Patient R.K. was undergoing treatment at Nanticoke Pulmonary, and

required in home oxygen equipment. R.K. had previously obtained oxygen equipment

from Peninsula and was currently using the equipment as part of his treatment. A few

days after one of his follow-up visits at Nanticoke Pulmonary, representatives of Lincare

arrived at his home with a full set of oxygen equipment. When R.K. notified them that he

already had the required oxygen equipment, the Lincare representatives told him that they

received the order from Nanticoke Memorial Hospital, and that R.K. needed to contact

Peninsula to return his current oxygen equipment. R.K. refused to accept Lincare's equipment, and contacted Peninsula, notifying O'Bier of the incident.

86.     Patient E.S. had been a patient of Peninsula where he obtained his BiPAP machine. He visited Nanticoke Sleep Disorder Center, where he was treated by Dr. Agarwal. Dr. Agarwal prescribed new settings for E.S.'s BiPAP machine and provided him with a prescription in which he specifically required that E.S. change his choice of DME company.

87.     Patient P.M.T. was prescribed a CPAP machine at the Nanticoke Sleep Disorder Center. P.M.T. was told by Johnson that they do not refer patients to Peninsula. Instead, P.M.T.'s prescription was sent to an out of state DME company, who sent him a CPAP machine. P.M.T. was personally billed for the CPAP machine and supplies because the DME company to which his prescription was sent was outside of P.M.T.'s insurance coverage network. P.M.T. had to return the CPAP machine, and contact Johnson demanding that his prescription be sent to Peninsula, further delaying P.M.T.'s CPAP treatment.

88.     Patient L.M. was prescribed a BiPAP machine by Dr. Agarwal at Nanticoke Sleep Disorder Center. The prescription was sent to BayView. L.M. contacted BayView and specifically requested that her prescription be sent to Peninsula. Once received by Peninsula, O'Bier discovered an error in the prescription. L.M. contacted Dr. Agarwal to notify him of the error and requested a new prescription. Dr. Agarwal refused to rewrite the prescription for at least one week, during which time he continuously tried to persuade L.M. to obtain her equipment from BayView instead of Peninsula.

89.     Patient W.M. had been a patient of Peninsula where he obtained his oxygen equipment. W.M. visited Nanticoke Sleep Disorder Center where he underwent a sleep study. Prior to receiving the results of his sleep study, W.M.'s prescription was sent to BayView despite the fact that he was already a patient of Peninsula. W.M. went to Peninsula to voice his concerns, wanting to know what was going on. O'Bier calmed

W.M. by explaining sleep apnea to him, and instructed W.M. to contact his physician at Nanticoke Pulmonary to lodge a complaint. W.M. had to personally contact BayView to notify them that he was Peninsula's patient, and request that his results and prescription be sent to Peninsula.

90.     Patient D.G. was a patient of Peninsula where she obtained her oxygen equipment. D.G. was undergoing treatment through Nanticoke Pulmonary, and was prescribed a CPAP machine and oxygen equipment. D.G.'s prescription was sent to Lincare and Lincare delivered a CPAP machine and new oxygen equipment to her. Upon arrival, D.G. notified the Lincare representatives that she already had the oxygen equipment. However, she was told that Nanticoke Pulmonary had ordered the new equipment and that she must contact Peninsula to return her current equipment. Lincare set up the new oxygen equipment at D.G.'s residence, and D.G. contacted Peninsula to remove her existing oxygen equipment.

91.     Patient J.O.C. had to wait approximately eight months for a CPAP machine prescribed by Dr. Agarwal's office. This delay was primarily caused by Dr. Agarwal's insistence on sending his prescription to DME companies other than Peninsula, despite the fact that those DME companies were not considered in network providers by J.O.C.'s insurance.

92.     Patient R.C.P. was unable to obtain his prescribed BiPAP machine because his prescription was only sent to Lincare, and R.C.P. was unable to afford the co-payment. Despite being aware of R.C.P.'s limited finances, his prescription was never sent to Peninsula or other DME companies.

93.     Patient L.A. was prescribed a CPAP machine by Dr. Agarwal. Dr. Agarwal's office insisted on sending L.A.'s prescription to Lincare which was not an in-network provider with L.A.'s insurance. L.A. had to contact Dr. Agarwal's office multiple times to have her prescription sent to Peninsula, almost a month after she was prescribed the CPAP machine.

94.     Patient D.S. had a sleep study performed at Dr. Agarwal's office, and was told the he would be prescribed a CPAP machine for treatment. D.S. who had not heard from Dr. Agarwal's office for more than two weeks, contacted Dr. Agarwal's office multiple times to inquire about his CPAP machine. After numerous attempts and messages, D.S. was informed that his CPAP machine was not ordered because the DME company used by Dr. Agarwal does not accept D.S.'s insurance. Dr. Agarwal's office notified D.S. that his prescription would be sent to another DME company recommended by Dr. Agarwal. Almost a month after his initial appointment, D.S. once again contacted Dr. Agarwal's office and was informed that the new DME company does not accept his insurance either. Concerned that Dr. Agarwal's office did not, at any point during the past month, discuss the DME companies the prescription was being sent to with him, D.S. contacted his insurance provider for assistance on receiving the CPAP machine. D.S. was informed by his insurance that he had the right to choose his own DME company, and that Dr. Agarwal's office should have provided him with a list of approved DME companies in the locality. Based on this information, D.S. attempted to contacted Dr. Agarwal's office multiple times to demand his prescription be sent to Peninsula. D.S. had to contacted Nanticoke Memorial's compliance officer and provided her with Peninsula's contact information so his prescription could be sent to Peninsula. In response Dr. Agarwal's office sent multiple incomplete facsimile transmissions to Peninsula, causing D.S. to personally go to Dr. Agarwal's office and obtain a copy of his prescription to take to Peninsula.

95.     As described above, Nanticoke Memorial, Dr. Agarwal, and Johnson have knowingly acted in violation of section 1395a of the Medicare statutes which guarantees a patient's right to freely choose a Medicare provider. *See* 42 U.S.C. § 1395a.

96.     Nanticoke Memorial, Dr. Agarwal, and Johnson's glaring violation of 42 U.S.C. § 1395a, combined with the almost exclusive referral to BayView and Lincare, strongly suggests that the Defendants are engaging in a prohibited referral scheme in

violation of the AKS and Stark laws and regulations.

97.     Furthermore, the above-mentioned acts by the Defendants' in ordering, delivering, and billing for DME which the patient already had, and requiring that the patient return the current equipment, contradicts the medical necessity requirement of Medicare regulations.

98.     O'Bier is currently unable to provide further evidence of the Defendants' alleged unlawful referral scheme because all necessary information lies within the Defendants' exclusive possession and control.

99.     Upon completion of discovery, O'Bier will introduce evidence that Defendants are engaged in an improper referral scheme in violation of the AKS and Stark laws.

**COUNT I**
**(For violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), against all Defendants)**

100.     O'Bier re-allege and incorporate by reference each allegation in paragraphs 1 to 99 of this Complaint.

101.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States of America false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

102.     Defendants' claims for payment or approval were false in that the services claimed for violated the AKS, violated the Stark laws, or otherwise did not qualify for reimbursement under the Medicare program.

103.     The United States of America, unaware of the falsity of the claims made or submitted by Defendants, paid and continues to pay Defendants for claims that would not be paid if the true facts were known.

104.     As a proximate cause of Defendants' false claims, the United States of

America has been damaged in an amount exceeding the jurisdictional limit, and to be proven at trial.

**COUNT II**
**(For violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), against all Defendants)**

105.     O'Bier re-alleges and incorporates by reference each allegation in paragraphs 1 to 104 of this Complaint.

106.     By virtue of the acts described above, Defendants knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States of America, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

107.     Defendants knowingly made or used or caused to be made or used false Medicare claim forms and supporting materials, such as false certifications of the truthfulness and accuracy of the claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States of America. The services claimed for were not medically necessary or otherwise did not qualify for reimbursement under the Medicare program.

108.     The United States of America, unaware of the falsity of the claims made or submitted by Defendants, paid and continues to pay Defendants for claims that would not be paid if the true facts were known.

109.     As a proximate cause of Defendants' false claims, the United States of America has been damaged in an amount exceeding the jurisdictional limit, and to be proven at trial.

**COUNT III**
**(For violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), against all Defendants)**

110.     O'Bier re-alleges and incorporates by reference each allegation in paragraphs 1 to 109 of this Complaint.

23

111.    By virtue of the acts described above, Defendants knowingly conspired to: (1) present or cause to be presented to the United States of America false or fraudulent Medicare claims for payment or approval; and (2) make or use a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States of America, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

112.    The United States of America, unaware of the falsity of the claims made or submitted by Defendants, and records or statements material to such claims, paid and continues to pay Defendants for claims that would not be paid if the true facts were known.

113.    As a proximate cause of Defendants' false claims, the United States of America has been damaged in an amount exceeding the jurisdictional limit, and to be proven at trial.

///

## PRAYER FOR RELIEF

WHEREFORE, O'Bier respectfully prays for judgment in her favor as follows:

1.      For statutory damages in an amount to be established at trial, and such penalties as are allowed by law;

2.      All costs and expenses of this action, including attorneys' fees, with pre- and post-judgment interest; and

3.      For all other relief that the Court deems just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, O'Bier demands a trial by jury in all issues so triable.



DATED:  April 9, 2019            Respectfully submitted,

KHOURI LAW FIRM


By:     *Michael J. Khouri*
MICHAEL J. KHOURI (CASBN 97654)
24012 Calle De La Plata, Suite 210
Laguna Hills, CA 92653
Phone: (949) 336-2433
Facsimile: (949) 387-0044
Email: mkhouri@khourilaw.com

*Attorneys for Plaintiff/Relator,*
CHRIS O'BIER